USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/17/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
MICROBOT MEDICAL, INC,                    :
                                          :
          Plaintiff, Counter-Defendant,   :
                                          :
          - against -                     :
                                          :
JOSEPH MONA,                              :
                                          :
          Defendant, Counter-Claimant.    :
-------------------------------------------------X

19-CV-3782 (GBD) (RWL)

**REPORT AND RECOMMENDATION
TO HON. GEORGE B. DANIELS:
MOTION FOR JUDGMENT
ON THE PLEADINGS
AND MOTION TO DISMISS**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Microbot Medical, Inc. ("Microbot"), seeks to recover short-swing profits from Defendant Joseph Mona ("Mona") under § 16(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78p(b).   Section 16(b) is a strict liability statute that prohibits a beneficial owner of more than 10% of a company's stock from buying or selling the company's stock within six months after acquiring beneficial ownership, and allows the company to recover any profits made by the beneficial owner during that period.

Microbot, an issuer of equity securities registered under § 12 of the Act, alleges that between November 2018 and January 2019, Mona was a beneficial owner of more than 10% of Microbot stock and engaged in prohibited transactions in violation of § 16(b).   Mona counterclaims that Microbot violated § 10(b) of the Act, 15 U.S.C. § 78j(b), and Rule 10b-5, promulgated thereunder and codified at 17 C.F.R. § 240.10b-5, by making material misstatements (1) in filings with the U.S. Securities and Exchange Commission ("SEC"), (2) during conference calls with investors, and (3) through investor-relations consultants who solicited investments by phone.

1

Before the Court are Microbot's motion for judgment on the pleadings with respect to its § 16(b) claim pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, as well as Microbot's motion to dismiss Mona's § 10(b) counterclaim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons set forth below, both of Microbot's motions should be GRANTED.

## Factual Background: Microbot's § 16(b) Claim[1]

Microbot is a Delaware corporation in the business of creating micro-robotic technology devices for use in various fields of medicine.  (Compl. ¶ 6.)  Mona resides in South Carolina.  (Compl. ¶ 8.)

On October 18, 2019, Mona filed a Form 3 "Initial Statement of Beneficial Ownership of Securities" with the SEC, indicating that as of November 16, 2018, he was the beneficial owner of 300,320 shares of "Microbot Medical Common Stock," which amounted to a 10.09% stake in the company's total outstanding common stock. (Compl. ¶¶ 13, 15; Tauber Decl., Ex. A, 10/18/2019 Form 3.)  That same day, Mona made a Form 5 "Annual Statement of Changes in Beneficial Ownership" filing with the SEC reporting certain trades that he had made while he was a beneficial owner of Microbot stock.  (Compl. ¶¶ 14-15; Tauber Decl., Ex. A, 10/18/2019 Form 5.)  Soon afterward, on October 28, 2019, Mona made another Form 5 filing reporting other such trades.  (Compl. ¶¶ 14-15; Tauber Decl., Ex. A, 10/28/2019 Form 5.)

---

[1] The Court draws the factual background from Microbot's Second Amended Complaint (Dkt. 44) ("Compl."), Mona's Answer and Counterclaim (Dkt. 59) ("Answer" or "Counterclaim"), and materials incorporated by reference in the pleadings – for instance, Mona's SEC filings attached as exhibits to Microbot's declaration filed in support of its motions (Affirmation of Miriam Tauber, Dkt. 82) ("Tauber Decl.").  As required for both a motion for judgment on the pleadings and a motion to dismiss, the Court accepts as true all non-conclusory allegations of the non-moving party's pleading and draws all reasonable inferences in favor of the non-moving party.

In his Answer, Mona asserts that from on or about November 19, 2018, to on or about January 14, 2019, he owned more than 10% of the outstanding common stock of Microbot and refers the Court to the SEC Forms 5 filed by him on October 18 and 28, 2019, for a complete and accurate recitation of their contents.   (Answer ¶ 3.)   The contents reveal the following:

|  | Date | Transaction | Shares | Price |
|---|---|---|---|---|
| (1) | Nov. 19, 2018 | Purchase | 2,400 | $2.99 |
| (2) | Nov. 21, 2018 | Purchase | 24,873 | $2.21 |
| (3) | Nov. 21, 2018 | Sale | 6,309 | $2.96 |
| (4) | Nov. 26, 2018 | Purchase | 37,986 | $1.95 |
| (5) | Jan. 8, 2019 | Sale | 2,269 | $2.70 |
| (6) | Jan. 9, 2019 | Purchase | 14,280 | $2.19 |
| (7) | Jan. 9, 2019 | Sale | 1,280 | $2.27 |
| (8) | Jan. 14, 2019 | Purchase | 1,773 | $6.43 |
| (9) | Jan. 14, 2019 | Sale | 281,773 | $8.16 |

(Tauber Decl., Ex. A, 10/18/2019 Form 5 and 10/28/2019 Form 5.)

Based on the foregoing facts, Microbot claims Mona "had a direct or indirect 'pecuniary interest' in all of the shares of Microbot common stock purchased and sold in the transactions identified" and "realized short swing profits … as a result of those transactions, which [Mona] must disgorge to Microbot in proportion to [his] respective pecuniary interest[ ] therein."  (Compl. ¶¶ 21-22.)

### Factual Background: Mona's § 10(b) Counterclaim

Mona began actively trading in Microbot stock on or about May 31, 2017, the day Microbot announced that the Canadian Intellectual Property Office had granted Microbot a patent for its Self-Cleaning Shunt ("SCS") for the treatment of hydrocephalus.[2]

---

[2] "Hydrocephalus is an abnormal buildup of fluid in the ventricles (cavities) deep within the brain.  This excess fluid causes the ventricles to widen, putting pressure on the brain's tissues."  *Hydrocephalus Fact Sheet*, NAT'L INST. OF NEUROLOGICAL DISORDERS &

(Counterclaim ¶¶ 33, 45.)  Two weeks earlier, on May 15, 2017, Microbot had filed a Form 10-Q with the SEC stating that management believed it had sufficient capital to fund operations for the twelve months following March 31, 2017.  (Counterclaim ¶ 45.)

Then, on June 5, 2017, Microbot announced that it would be raising $10 million through the issuance and sale of 3,750,000 new shares, which included entering into a share purchase agreement (the "SPA") with Sabby Healthcare Master Fund Ltd. and Sabby Volatility Warrant Master Fund Ltd. (collectively, "Sabby").  (Counterclaim ¶ 47.) A provision in the SPA characterized Alpha Capital Anstalt ("Alpha") as "affiliated" with Microbot, which, if true, would have limited Alpha's ability to liquidate its Microbot shares pursuant to SEC rules.  (Counterclaim ¶ 48.)  Alpha, however, was not an affiliate of Microbot; and, around the time the SPA was executed, Alpha converted its preferred stock into common stock and began selling shares in large quantities, which caused the price of Microbot stock to decline by 67%.[3]  (Counterclaim ¶¶ 50, 52.)

On August 14, 2017, Microbot filed a Form 10-Q with the SEC stating that management believed it had sufficient capital to fund operations for the twelve months following the date of the financial statements therein.  (Counterclaim ¶ 53.)  Also on August 14, 2017, Microbot convened an investor conference call during which Harel Gadot, Microbot's CEO, stated that (1) Microbot had sufficient capital for the next twenty-four to thirty months and (2) Microbot was well placed in the market compared to its competitors because it had a "five-year head start" – even though one month earlier,

---

STROKE,  https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/ Hydrocephalus-Fact-Sheet (last updated May 13, 2020).

[3] Sabby sued Microbot on the basis of the "affiliated" misrepresentation.  On February 28, 2019, the New York State Supreme Court found that Microbot had breached multiple representations and warranties in the SPA.  (Counterclaim ¶ 52.)

Alcyone Lifesciences Inc. ("Alcyone") had submitted to the U.S. Food and Drug Administration (the "FDA") a request for approval of a directly competing, alternative device that also treated hydrocephalus, which the FDA approved on November 15, 2017.  (Counterclaim ¶¶ 54-55, 57-59.)

In the meantime, certain investor-relations ("IR") consultants made statements directly to Mona about Microbot's financial health and business dealings.  (Counterclaim ¶ 65.)  Specifically, on or around August 7, 2017, Jeremy Roe called Mona and characterized Microbot stock as "lightning in a bottle," asserted that "the shares were going to get to $10" from around $1, and urged Mona to buy more shares as Roe himself had "just purchased an additional 10,000 shares in the company." (Counterclaim ¶ 66.)  On or around October 2, 2017, Tony Altavilla called Mona and told him that Gadot was "out in Minneapolis on business, meeting two Fortune 500 companies," and that Altavilla expected Microbot "to sign an SCS partnership any day." (Counterclaim ¶ 67.)  During an investor town hall conference call held on February 1, 2018, Gadot stated that Microbot shares were "extremely cheap."  (Counterclaim ¶ 62.)

Mona's trading in Microbot was considerable.  For instance, in the period between August 2017 and May 2018, Mona accumulated some 1.69 million shares of Microbot, representing a 331% increase in his holdings of Microbot's stock.  Mona claims he accumulated the shares in reliance on Gadot's statements and Microbot's SEC Form 10-Q filings concerning the financial health of the company.  (Counterclaim ¶ 68.)

On September 8, 2018, Microbot announced a "reverse split" share structure under which, for every fifteen shares an investor owned, they would thereafter own only

one share.  (Counterclaim ¶ 70.)  Shortly before the reverse split, Microbot's stock price had dropped by about 39% since August 2017; immediately after the split, however, the price rose about 1,000%, which reflected only the decreased number of shares and did not compensate shareholders for the reduction of their shares.  (Counterclaim ¶¶ 70-71.)

On November 14, 2018, Microbot filed a Form 10-Q with the SEC stating that management believed it had sufficient capital to fund operations for the next twelve months.  (Counterclaim ¶ 72.)  On December 31, 2018, Microbot filed an amended preliminary prospectus on Form S-1 with the SEC announcing that it would be offering an additional 6,024,096 shares once its registration statement was effective.  (Counterclaim ¶ 74.)  Upon learning of this news, Mona decided to dispose of the majority of his holdings.  (Counterclaim ¶ 75.)

On January 15, 2019, Microbot offered 330,000 new shares, which were purchased by an institutional investor the following day; and on January 23, 2019, Microbot announced a direct offering of another 250,000 shares to institutional investors.  (Counterclaim ¶ 77.)  By the time Mona fully exited his Microbot position on February 19, 2019, he had incurred a net loss of $150,954.  (Counterclaim ¶ 78.)

## Procedural Background

This action was filed on April 28, 2019, and assigned to the Honorable George B. Daniels, U.S.D.J.  (Dkt. 1.)  The initial Complaint named only Alliance Investment Management Ltd. ("Alliance") as the defendant, seeking to recover short-swing profits under § 16(b) of the Act.  (Dkt. 1.)  Before Alliance could respond to Microbot's Complaint, Microbot filed an Amended Complaint on June 5, 2019, in which Microbot

reasserted its § 16(b) claim but added a claim for injunctive relief under § 13(d) of the Act.[4]  (Dkt. 13.)

On October 28, 2019, Alliance filed a motion for summary judgment, arguing that it was merely a broker dealer that had mistakenly made SEC filings taking credit for the beneficial ownership and transactions of one of its clients, Joseph Mona.  (Dkt. 38.) Microbot and Alliance attended a telephonic discovery conference before the undersigned on November 7, 2019, and, in an Order issued that same day, the Court granted Microbot's request to file a second amended complaint to add Mona as a defendant.  (Dkt. 41.)

Microbot filed its operative Second Amended Complaint on November 18, 2019, dropping its § 13(d) claim but naming both Alliance and Mona as defendants liable "singly, jointly, or in the alternative"; and maintaining that it would "need to discover the respective pecuniary interests of each of the Defendants, if any, and proceed against that or those Defendants to the extent thereof."  (Compl. ¶¶ 16, 22.)

On December 3, 2019, Alliance renewed its motion for summary judgment.  (Dkt. 45).  In the next two months, Microbot and Alliance filed cross-motions for sanctions under Rule 11 of the Federal Rules of Civil Procedure.  (Dkts. 54, 68.)

Mona filed his Answer and Counterclaim on February 4, 2020, alleging violations of § 10(b) of the Act and Rule 10b-5.  (Dkt. 59.)  On March 6, 2020, Microbot filed a

---

[4] Section 13(d) requires a person or group of persons acquiring beneficial ownership of more than 5% of a voting class of a company's equity securities registered under § 12 of the Act to file a Schedule 13D with the SEC reporting the acquisition and other information (such as the filer's identity, funding, and purposes) within ten days after the purchase.  *See Schedules 13D and 13G*, SEC, https://www.investor.gov/introduction-investing/investing-basics/glossary/schedules-13d-and-13g (last visited Dec. 18, 2020).

motion for judgment on the pleadings with respect to its § 16(b) claim against Mona, as well as a motion to dismiss Mona's § 10(b) Counterclaim.  (Dkt. 80.)

Days earlier, on March 2, 2020, this case was referred to the undersigned for Report and Recommendation on all dispositive motions.  (Dkt. 74.)  I issued a Report and Recommendation on August 18, 2020, recommending that Alliance's motion for summary judgment be granted, Microbot's claims against Alliance be dismissed with prejudice, and both parties' cross-motions for sanctions be denied.  (Dkt. 97.)  On September 17, 2020, Judge Daniels adopted that Report and Recommendation in full. (Dkt. 98.)  Microbot's remaining motions against Mona are the subject of the instant Report and Recommendation.

In the discussion that follows, the Court will attend first to Microbot's motion for judgment on the pleadings and then to Microbot's motion to dismiss Mona's Counterclaim.

## **Legal Standards**

"Judgment on the pleadings is appropriate if, from the pleadings, the moving party is entitled to judgment as a matter of law."  *Burns International Security Services, Inc. v. International Union, United Plant Guard Workers*, 47 F.3d 14, 16 (2d Cir. 1995); *see also* Fed. R. Civ. P. 12(c).  The standard for addressing a motion for judgment on the pleadings pursuant to Rule 12(c) is the same as the standard used in evaluating a motion to dismiss under Rule 12(b)(6).  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011); *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).

To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss for failure to state a cause of action, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the [non-moving party's] favor." *Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (internal quotation marks and citation omitted). This tenet, however, is "inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, … i.e., enough to make the claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and citations omitted). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court generally is confined to the facts alleged in the complaint. *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). A court may, however, consider additional

materials, including documents attached to the complaint, documents incorporated into the complaint by reference, matters of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013). In that regard, if "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Poindexter v. EMI Record Group Inc.*, No. 11-CV-559, 2012 WL 1027639, at *2 (S.D.N.Y. March 27, 2012) (citing *Barnum v. Millbrook Care Limited Partnership*, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994)).

## Microbot's Motion for Judgment on the Pleadings

In its motion for judgment on the pleadings, Microbot argues that § 16(b) imposes strict liability on Mona based on his acknowledged beneficial ownership of more than 10% of Microbot stock and trading within less than six months. (MBOT Mem. at 1.[5]) In opposition, Mona argues that his trading was involuntarily induced by Microbot's "fraudulent coercion," and therefore the transactions at issue are "unorthodox" and beyond the reach of § 16(b). (MJP Opp. at 10.[6]) Additionally, Mona asserts equitable and statutory affirmative defenses – unclean hands and "windfall" under § 28(a) of the Act. (Answer ¶¶ 24-30.) For the following reasons, Microbot's motion for judgment on the pleadings should be granted.

---

[5] "MBOT Mem." means Microbot's Brief in Support of Plaintiff's Fed. R. Civ. P. 12(c) Motion for Judgment on the Pleadings; Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Defendant Mona's Counterclaim. (Dkt. 81.)

[6] "MJP Opp." means Mona's Opposition to Plaintiff's Fed. R. Civ. P. 12(c) Motion for Judgment on the Pleadings. (Dkt. 88.)

## A.      Section 16(b) of the Act

Pursuant to § 16(b) of the Act, an insider's short-swing profits are subject to disgorgement.  *See* 15 U.S.C. § 78p(b).  Statutory insiders include directors, officers, and beneficial owners of more than 10% of any class of a company's registered equity securities.  15 U.S.C. § 78p(a)(1).  Rule 16a-1(a)(1) defines "beneficial owner" as any person who is deemed a beneficial owner under § 13(d) of the Act and also owns more than 10% of any class of an issuer's equity securities registered under § 12 of the Act. 17 C.F.R § 240.16a-1(a)(1).  Rule 13d-3(a), which governs § 13(d) of the Act, in turn defines a "beneficial owner" of a security as any person who has "[v]oting power which includes the power to vote, or to direct the voting of, such security; and/or [i]nvestment power which includes the power to dispose, or to direct the disposition of, such security."  17 C.F.R. § 240.13d-3(a)(1)-(2).

The Act imposes strict liability for improper trading by an insider.  Section 16(b) states in relevant part:

> For the purpose of preventing the unfair use of information which may have been obtained by [an insider] by reason of his relationship to the issuer, any profit realized by [the insider] from any purchase and sale, or any sale and purchase, of any equity security of such issuer … within any period of less than six months … shall inure to and be recoverable by the issuer, irrespective of any intention on the part of [the insider].

15 U.S.C. § 78p(b).

"A vital component of the Exchange Act, § 16(b) was designed to prevent an issuer's directors, officers, and principal stockholders from engaging in speculative transactions on the basis of information not available to others."  *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170, 173-74 (2d Cir. 2012) (internal quotation

marks omitted).   It was "crafted as a blunt instrument to impose[ ] a form of strict liability," requiring "no showing of actual misuse of inside information or of unlawful intent."   *Id.* at 174 (internal quotation marks and citations omitted).   In other words, it "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power Co. v. Dow Chemical Co.*, 136 F.3d 316, 320-21 (2d Cir. 1998).

To state a plausible claim under § 16(b), a plaintiff must plead facts sufficient to show "'that there was (1) a purchase and (2) a sale of securities (3) by an [insider] (4) within a six-month period.'"   *Chechele v. Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (quoting *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998)).

It is undisputed that Mona sold Microbot stock within six months after becoming a beneficial owner of more than 10% of Microbot common stock (i.e., a Microbot insider). (Compl. ¶¶ 13-15; Answer ¶¶ 3, 5; Tauber Decl., Ex. A, 10/18/2019 Form 5 and 10/28/2019 Form 5.)   Nonetheless, Mona argues that "[he] had amassed his underlying position in Microbot based on an array of … false and misleading statements made by Microbot's officers, directors, agents, and in SEC filings over the previous two years"; and then "exit[ed] his position in order to save himself" when "he came to understand that Microbot's threatened massive offering (apparently finalized two weeks earlier and awaiting SEC approval) stood to triple the number of outstanding Microbot shares, and thereby dilute him by two thirds."   (MJP Opp. at 7-8.)   Mona claims that "he had no choice" but to exit – the alternative was "to do nothing and watch Microbot effectively take his money after it fraudulently induced him to amass a large position in the stock." (MJP Opp. at 8.)   "[A]t issue here," Mona alleges, "is … *Microbot's* fraudulent coercion

and the massive dilution which rendered Mona's purchases involuntary and therefore unorthodox" and beyond the reach of § 16(b); consequently, judgment on the pleadings is premature "without further factual investigation at least as to Microbot's fraud."  (MJP Opp. at 9-10.)

Microbot, on the other hand, argues that under the well-established precedent set forth by the Supreme Court, the Second Circuit, and this District, the unorthodox transaction exception does not apply to Mona's trades as they were "ordinary cash-for-stock transaction[s]" on the open market.  (MBOT Reply at 3, 5.[7])  Microbot is correct.

## B.    Mona's Trades Were Prohibited and Are Not Saved by the Unorthodox Exception

*Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973), is the foundational case that sets forth the unorthodox transaction exception, which rescues certain "unorthodox" transactions that otherwise would fall within the ambit of the plain text of § 16(b).  In *Kern*, Occidental Petroleum Corp. ("Occidental") acquired more than 10% of the outstanding stock of a target corporation by tender offer, but its hostile takeover efforts were blocked by a defensive merger between the target corporation and an acquiring corporation.  Pursuant to the terms of the merger agreement between the target corporation and the acquiring corporation, Occidental became irrevocably bound to exchange its shares of the target corporation for shares of the acquiring corporation's preferred stock.  In light of "the involuntary nature of Occidental's exchange, … coupled with the absence of the possibility of speculative

---

[7] "MBOT Reply" means Microbot's Reply Brief in Support of Plaintiff's Fed. R. Civ. P. 12(c) Motion for Judgment on the Pleadings; Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Defendant Mona's Counterclaim.  (Dkt. 92.)

abuse of inside information," the Supreme Court held that Occidental's transactions did

not constitute "sales" within meaning of § 16(b).  411 U.S. at 595-600.

The Supreme Court explained,

> Although traditional cash-for-stock transactions that result in a purchase and sale or a sale and purchase within the six-month, statutory period are clearly within the purview of § 16(b), the courts have wrestled with the question of inclusion or exclusion of certain "unorthodox" transactions. The statutory definitions of "purchase" and "sale" are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase.  In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent – the realization of short-swing profits based upon access to inside information – thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits.

*Id.* at 593-595.  In other words, the threshold question is whether the transactions at

issue are "traditional cash-for-stock transactions that result in a purchase and sale or a

sale and purchase within the six-month, statutory period."  *Id.* at 593.  If so, then the

transactions "are clearly within the purview of § 16(b)."  *Id.*  If not, then the question is

whether the transactions are "unorthodox" or "borderline" because they are "not

ordinarily deemed a sale or purchase," the statutory definitions of which are "broad."  *Id.*

at 593-94.  "Sale" means "any contract to sell or otherwise dispose of"; "purchase"

means "any contract to buy, purchase, or otherwise acquire."  15 U.S.C. § 78c(a)(13),

(14).  Examples of unorthodox transactions provided by the Supreme Court include

"stock conversions, exchanges pursuant to mergers and other corporate

reorganizations, stock reclassifications, and dealings in options, rights, and warrants."

411 U.S. at 593 n.24.

As Microbot aptly argues, "the most fundamental requirement of the 'unorthodox transaction' exemption ... is that the transaction must, in fact, be 'unorthodox' – i.e., not an ordinary cash-for stock transaction."  (MBOT Reply at 5.)  Mona's purchases and sales of Microbot stock were traditional buy-sale stock transactions – they did not occur in the context of a corporate takeover or other such scenario that has been recognized as unorthodox.  Mona cannot credibly claim otherwise.

Mona points to *Portnoy v. Seligman & Latz, Inc.*, 516 F. Supp. 1188 (S.D.N.Y. 1981), to highlight the "'evolution of the Second Circuit's jurisprudence on section 16(b)'" in adopting a "'pragmatic'" approach that at times "'requires the court to explore beneath the surface to explain why a transaction within the literal terms of the statute should not be treated as one.'"  (MJP Opp. at 5 (quoting *Portnoy*, 516 F. Supp. at 1192-93).)  Mona does not mention, however, that the *Portnoy* defendants escaped the strict grasp of § 16(b) because "this case involve[d] only one transaction attributable to them and ... this transaction was only a sale of warrants, not an exercise of warrants followed by a profit taking."  516 F. Supp. at 1195.  That is, both *Portnoy* and the "pragmatic" approach are inapposite here because *Portnoy* actually involved an unorthodox transaction – a "dealing[ ] in ... warrants" structured as a single rather than pair of transactions[8] – instead of a traditional "cash-for-stock transaction[ ]."  *Id.*  Indeed, the *Portnoy* court made crystal clear that "no case either before or after *Kern County* has exempted cash-for-stock transactions from the automatic application of section 16(b)

---

[8] "To trigger section 16(b) liability there must be both a purchase and a sale" – i.e., a pair of transactions – to be "matched."  *Chechele*, 758 F.3d at 471.

….…"  516 F. Supp. at 1197 (quoting *Tyco Laboratories, Inc. v. Cutler-Hammer, Inc.*, 490 F. Supp. 1, 6-7 (S.D.N.Y. 1980)).[9]

The last refuge to which Mona retreats is *American Standard, Inc. v. Crane Co.*, 510 F.2d 1043 (2d Cir. 1974), which Mona argues is "most akin" to his situation. (MJP Opp. at 10.)  There, the Second Circuit confronted the case of "a tender offeror who [did] not have access to inside information about the target company by virtue of his position as a 'beneficial owner,' coupled with an inability, as further evidenced by the vote on the merger, to affect the course of the target company."  510 F.2d at 1055. Finding the case's similarity to *Kern* "striking," the Second Circuit concluded that "the exchange of stock pursuant to the merger terms was not a 'sale' for § 16(b) purposes." *Id.* at 1053, 1055.  Like *Kern* and unlike the instant case, *American Standard* involved "a takeover situation with a contest for control[,] a defensive merger that defeated the takeover bid," and a merger agreement that dictated the exchange of stock.  *Id.* at 1052. But, with respect to "'garden-variety purchase and sale or sale and purchase within six months,'" the *American Standard* court reaffirmed what was true then and what is true now: § 16(b) operates as a "'crude rule of thumb'" on traditional cash-for-stock transactions.  *Id.* at 1053 (quoting *Abrams v. Occidental Petroleum Corp.,* 450 F.2d 157,

---

[9] In *Tyco Laboratories*, the court rejected a shareholder's argument that a "control contest type of situation" rendered "unorthodox" their purchases and sales of "common stock in open market brokerage transactions for cash" and therefore warranted inquiry into whether the shareholder had access to inside information.  The court explained that "what the Supreme Court actually stated is that a 'cash-for-stock' transaction is orthodox and results in automatic section 16(b) liability."  *Tyco Laboratories*, 490 F. Supp. at 2, 6. Mona attempts at length to distinguish the instant case from *Tyco Laboratories* by arguing that he "had amassed his underlying position in Microbot based on an array of additional false and misleading statements made by Microbot's officers, directors, agents, and in SEC filings over the previous two years."  (MJP Opp. at 7.)  Issuer fraud, however, is not a cognizable defense to imposition of § 16(b) liability, as the Court explains further below.

162 (2d Cir. 1971), *aff'd sub nom. Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973)).

## C.    Mona's Equitable and Statutory Affirmative Defenses Are Unavailing

Mona asserts two affirmative defenses – unclean hands and windfall under § 28(a) of the Act.   With respect to the former, Mona argues that "[i]t would be inequitable for [Microbot] to obtain 16(b) damages from [him] when his share purchases were undertaken on reliance of [Microbot]'s false and misleading statements, his sales were solely to avoid financial harm by [Microbot]'s abusive dilution tactics, and his net loss after exiting Microbot stock was in excess of $150,000."   (Answer ¶ 26.)   With regard to the latter, Mona claims that "Section 28(a) of the Securities Exchange Act limits the amount recoverable in any lawsuit for damages brought under the Act to 'a total amount [not] in excess of the actual damages to that person on account of the act complained of,'" and that Microbot "was not actually damaged."   (Answer ¶¶ 27, 30 (quoting 15 U.S.C. § 78bb(a)(1)).)

Microbot maintains that generally there are no equitable defenses, such as unclean hands, to § 16(b) liability based on an issuer's actions or intentions.   And, although conceding that the statutory windfall defense applies to "actual damages," Microbot claims that § 16(b) is a "prophylactic measure" to which § 28(a) does not apply.   (MBOT Mem. at 9-10, 12-13.)   Mona does not proffer any meaningful arguments in support of either of his affirmative defenses.   Nor could he, as explained next.

### 1.    Unclean Hands

Generally, unclean hands is an equitable defense that applies only to equitable claims.   *See Henderson v. United States*, 575 U.S. 622, 622 n.1 (2015) ("The unclean

hands doctrine proscribes equitable relief when, but only when, an individual's misconduct has 'immediate and necessary relation to the equity that he seeks.'") (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933)); *Carmen v. Fox Film Corp.*, 269 F. 928, 931 (2d Cir. 1920) ("One who comes into equity must come with clean hands …."). Microbot, however, does not seek equitable relief; it seeks legal relief.

Even assuming for the sake of argument that unclean hands can be a defense to Microbot's legal claim, courts in this District have resoundingly rejected the applicability of equitable defenses to § 16(b) claims. *See Huppe ex rel. WPCS International Inc. v. Special Situations Fund III QP, L.P.*, 565 F. Supp. 2d 495, 502 (S.D.N.Y. 2008) ("nothing in the statute permits the Court to consider as a mitigating factor the issuer's intent or any benefit inuring to the issuer, nor is there any equitable defense available based on such theories") (collecting cases), *aff'd*, 670 F.3d 214 (2d Cir. 2012); *Donoghue v. Natural Microsystems Corp.*, 198 F. Supp. 2d 487, 491 (S.D.N.Y. 2002) (In pari delicto "and other such equitable defenses are generally not available in actions under Section 16(b). … In fact, equitable defenses have been rejected in this Circuit even where the issuer participated in the transaction and where a transaction occurred at the incentive of the issuer.") (collecting cases); *accord Analytical Surveys, Inc. v. Tonga Partners, L.P.*, No. 06-CV-2692, 2008 WL 4443828, at *7 (S.D.N.Y. Sept. 29, 2008), *aff'd*, 684 F.3d 36 (2d Cir. 2012); *see also Texas International Airlines v. National Airlines, Inc.*, 714 F.2d 533, 536 (5th Cir. 1983) ("The case law uniformly rejects equitable defenses in section 16(b) cases. … Indeed, the courts have not accepted equitable defenses even in cases where the issuer participated in the transaction or

where the transaction giving rise to the profit occurred at the incentive of the issuer itself.") (citing, *inter alia*, *Roth v. Fund of Funds, Ltd.*, 405 F.2d 421, 421-23 (2d Cir. 1968); *Magida v. Continental Can Co.*, 231 F.2d 843, 846 (2d Cir. 1956)).

Mona manages no more than an anemic response.  First, he asserts that Microbot did not merely provide him with the "incentive" to trade; rather, it defrauded him into doing so.  But none of the precedent as set forth above indicates that this distinction has any significance with respect to the viability of an equitable defense such as unclean hands to avoid liability under § 16(b), and Mona has not presented the Court with any such authority.[10]  Second, Mona makes a half-hearted argument that *Analytical Surveys* is distinguishable because there "the Section 16(b) defendant was in full control of the transactions that formed the basis of its 16(b) liability" and could not establish the "two factors" of the unorthodox transaction exception.  (MJP Opp. at 9-10.) That purported distinction, however, confuses two separate issues – the availability of equitable defenses and the applicability of the unorthodox transaction.  Neither helps Mona here.

### 2. Windfall under § 28(a) of the Act

Section 28(a) of the Act states in relevant part that "[n]o person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in 1 or more actions, a total amount in excess of the actual damages to that person on account of the act complained of."  15 U.S.C. § 78bb(a)(1). Mona claims that § 16(b) imposes liability for actual damages and that Microbot as an

---

[10] The absence of an equitable defense, however, does not leave investors claiming fraud without a remedy.  They may of course assert claims for fraud, assuming they can and do plead sufficient facts.  As discussed below, Mona has not done so in this instance.

issuer suffered no actual damages; consequently, under § 28(a), Microbot may not recover "a total amount … in excess of the actual damages" that it sustained – i.e., more than zero.  (Answer ¶¶ 27-30.)  In response, Microbot argues that § 16(b) is not a damages remedy but rather a "prophylactic measure"; and, alternatively, that there is no "existence or extent" of "damages" at all, only a "mechanical[ ]" calculation of profits.  (MBOT Mem. at 12-13.)   Section 28(a) therefore does not apply to Microbot's claim.  Microbot is correct.

On the one hand, "the purpose of section 28(a) is to compensate civil plaintiffs for economic loss suffered as a result of wrongs committed in violation of the 1934 Act." *Osofsky v. Zipf*, 645 F.2d 107, 111 (2d Cir. 1981).  On the other hand, in passing § 16(b), "Congress recognized that short-swing speculation by stockholders with advance, inside information would threaten the goal of the Securities Exchange Act to 'insure the maintenance of fair and honest markets.'"  *Kern*, 411 U.S. at 591 (quoting 15 U.S.C. § 78b).  Congress therefore "'chose a relatively arbitrary rule capable of easy administration'" as "'[s]uch arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect.'"  *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 422 (1972) (quoting *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970)).  In other words, whereas the purpose of § 28(a) is "to compensate civil plaintiffs for economic loss," *Osofsky*, 645 F.2d at 111, § 16(b) is "a strict prophylactic rule" meant to ensure the integrity of the securities markets, *Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 251 (1976).

Disgorgement of short-swing profits pursuant to § 16(b) is thus a separate and independent remedy from any damages that may be available to an issuer seeking

redress for insider misconduct.  *See Rubenstein v. International Value Advisers, LLC*, 959 F.3d 541, 547 (2d Cir. 2020) ("Section 16(b) addresses only a narrow class of potential insider trading. … Trading that passes muster under Section 16(b) may not do so under Rule 10b-5."); *Steel Partners II, L.P. v. Bell Industries*, Inc. 315 F.3d 120, 127 (2d Cir. 2002) ("As we have noted, Section 16(b) cannot and does not seek to punish all possible abuses by an insider.").  Furthermore, § 16(b) does not even refer to "damages"; rather, it requires a disgorgement of profit be made in service of what the prohibition was meant to accomplish.  *See* 15 U.S.C. § 78p(b) ("For the purpose of preventing the unfair use of information … any profit realized … shall inure to and be recoverable by the issuer ….").

Indeed, at least in the context of SEC enforcement actions, the Second Circuit has identified disgorgement as an entirely distinct remedy from compensatory damages. *See SEC. v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014) ("Because disgorgement is not compensatory, it forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court, even if it exceeds actual damages to the victim.") (internal quotation marks and citation omitted); *SEC. v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006) ("'[T]he primary purpose of disgorgement is not to compensate investors.  Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched.'") (quoting *SEC. v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978)); *SEC. v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) ("Although disgorged funds may often go to compensate securities fraud victims for their losses, such compensation is a distinctly secondary goal.").

21

In short, § 28(a) and § 16(b) serve separate purposes and provide distinct remedies. Mona cites to no contrary authority, and his windfall argument is unavailing.

## C.  Calculating Mona's Short-Swing Profits

The final issue is how Mona's short-swing profits are to be calculated. The parties agree on the basic methodology: Mona's short-swing profits are to be calculated according to the lowest-in, highest-out method, which "has been consistently and diligently followed by courts in the Second Circuit." *Morales v. Consolidated Oil & Gas, Inc.*, No. 81-CV-4871, 1982 WL 1328, at *4 (S.D.N.Y. July 17, 1982) (collecting cases); *see also Smolowe v. Delendo Corp.*, 136 F.2d 231, 239 (2d Cir. 1943) ("The only rule whereby all possible profits can be surely recovered is that of lowest price in, highest price out – within six months"). "[T]he trades must be matched in a manner that maximizes the disgorgeable amount …. This is accomplished by matching the highest sale prices with the lowest purchase prices within the six month period." *Segen ex re. KFx Inc. v. Westcliff Capital Management, LLC*, 299 F. Supp. 2d 262, 272 (S.D.N.Y. 2004). "Pursuant to this method of computation, [an insider's] short swing profits may be calculated by matching … his highest-priced and hence most profitable sales transactions … with the same number of shares purchased for the least cost. The remaining sales transactions that did not produce profits are dropped from the equation." *Donoghue v. MIRACOR Diagnostics, Inc.*, No. 00-CV-6696, 2002 WL 233188, at *3 (S.D.N.Y. Feb. 11, 2002).

As set forth earlier, the following table summarizes Mona's relevant purchases and sales while a beneficial owner of more than 10% of Microbot stock:

|     | Date          | Transaction | Shares  | Price  |
| --- | ------------- | ----------- | ------- | ------ |
| (1) | Nov. 19, 2018 | Purchase    | 2,400   | $2.99  |
| (2) | Nov. 21, 2018 | Purchase    | 24,873  | $2.21  |
| (3) | Nov. 21, 2018 | Sale        | 6,309   | $2.96  |
| (4) | Nov. 26, 2018 | Purchase    | 37,986  | $1.95  |
| (5) | Jan. 8, 2019  | Sale        | 2,269   | $2.70  |
| (6) | Jan. 9, 2019  | Purchase    | 14,280  | $2.19  |
| (7) | Jan. 9, 2019  | Sale        | 1,280   | $2.27  |
| (8) | Jan. 14, 2019 | Purchase    | 1,773   | $6.43  |
| (9) | Jan. 14, 2019 | Sale        | 281,773 | $8.16  |

The short-swing window consists of the transactions from November 19, 2018, to January 14, 2019. In the short-swing window, Mona sold a total of 291,631 shares but purchased only 81,312 shares. Thus, only 81,312 shares are to be matched. The resulting matching is: (81,312 * $8.16) – ((37,986 * $1.95) + (14,280 * $2.19) + (24,873 * $2.21) + (2,400 * $2.99) + (1,773 * $6.43)) = $484,614.30.[11] That is the amount of Mona's short swing profits.

Although Mona does not disagree with the lowest-purchase, highest-sale methodology, he contests the length of the short-swing window. Specifically, Mona contends the appropriate trade date to use is the settlement date, not the execution date, which has the benefit to Mona of accounting for Microbot's "dilutive activity":

> Mona's January 14, 2019 transactions, during which he allegedly exited a greater than 10% position, did not settle until January 17, 2019, three days after those trades were made. Prior to the settlement date, on January 15, 2019, Microbot registered a direct offering which increased the total shares outstanding …. As a result, by the time all of Mona's January 14 trades settled on January 17, Mona held a greater than 10% position in Microbot for less time (and a fewer number of trades) than Plaintiff calculates, because

---

[11] Microbot presented calculations that do not follow the proper methodology. Accordingly, the Court has calculated the short-swing profits pursuant to the methodology directed by the case law. That correction, however, favors Microbot insofar as it results in a higher calculation of profits than Microbot's incorrect calculation.

> his holdings … represented a smaller fraction of the (increased) outstanding stock as of January 16.  Preliminary estimates … indicate that based on MBOT's dilutive activity, twelve of Mona's trades on January 14, 2019, representing the sale of 34,500 MBOT shares, should not be included in the short swing window.

(MJP Opp. at 12-13.)

As Microbot correctly responds, however, "it is well-settled that the date of a securities transaction for Section 16 purposes is the execution date, and not the settlement date."  (MBOT Reply at 13.)  The Court recently reaffirmed that principle, recognizing that "the operative date for Section 16(b) purposes is the date of execution, not settlement."  *Chechele v. Dundon*, No. 19-CV-10544, 2020 WL 4748298, at *4 (S.D.N.Y. Aug. 17, 2020) (Daniels, J.) (citing *Donoghue v. Patterson Companies, Inc.*, 990 F. Supp. 2d 421, 426 (S.D.N.Y. 2013)).  "In determining when the sale occurred, the 'critical moment' is the 'point at which the investor becomes irrevocably committed to the transaction and, in addition, no longer has control over the transaction in any way that could be turned to speculative advantage by the investor.'"  *Rubenstein v. vTv Therapeutics, Inc.*, No. 15-CV-9752, 2017 WL 1194688, at *3 (S.D.N.Y. March 30, 2017) (quoting *Prager v. Sylvestri*, 449 F. Supp. 425, 431-33 (S.D.N.Y. 1978)); *cf. Rubenstein*, 2017 WL 1194688 at *4 ("Defendants were 'irrevocably bound' to transfer the shares at the time they agreed to the terms of the Letter Agreement, which contractually committed them to providing the predetermined value in securities in the event of an IPO. … [T]he relevant date of sale in this context is the date of the contract's execution."); *Donoghue*, 990 F. Supp. 2d at 424 (In "cases involving prepaid variable forward contracts and Section 16(b) … the relevant purchase or sale date for the contract was that of the contract's execution.").

24

Here, the operative date of Mona's trades in dispute is the date on which Mona executed those trades through his broker dealer: January 14, 2019.  Consequently, the calculation of § 16(b) damages is unaffected by Microbot's "dilutive activity," which according to Mona took place on January 15, 2019.[12]  There thus is no issue of fact to preclude granting Microbot judgment on the pleadings in the amount of $484,614.30, representing Mona's prohibited short-swing profits.[13]

<u>**Motion to Dismiss Mona's Counterclaim**</u>

Mona accuses Microbot of securities fraud.  He alleges that between May 2017 and February 2018, Microbot, Microbot's CEO, and Microbot's agents made several material misstatements or omissions "about Microbot's competitive position in the market and [its] financial health and cash position," which fraudulently induced Mona into "accumulating and holding Microbot stock" as part of "a systematic cycle to manipulate [Microbot's] stock price."  (Counterclaim ¶¶ 35-36.)  As explained by Mona,

> This manipulative conduct involved first, the company releasing some "positive news" to the market.  Next, shareholders (sometimes including Mona) would purchase stock in response to the news, which would have the effect

---

[12] Mona also argues that judgment on the pleadings is premature "[b]ecause Plaintiff pleaded joint, several, and alternative liability as between Alliance and Mona, a factual allegation which Mona disputes, unless and until Plaintiff (1) dismisses Alliance from the case, or (2) Alliance wins its pending motion for summary judgment."  (MJP Opp. at 12.)  Since the Court already has granted Alliance summary judgment and dismissed Alliance from the case with prejudice, this argument is moot.

[13] The Court acknowledges § 16(b)'s "crude," "harsh," and "Draconian" strict liability regime.  *Rosen v. Price*, No. 95-CV-5089, 1997 WL 401793, at *4 (S.D.N.Y. July 16, 1997) (internal quotation marks omitted).  Indeed, "an individual may be charged with a Section 16(b) 'profit' even when his or her relevant trading actually resulted in a substantial financial loss" – just as is the case here.  *Lowinger v. Morgan Stanley & Co. LLC*, 841 F. 3d 122, 129 n.6 (2d Cir. 2016).  But whether it is wise and just for a trader like Mona to be swept up in such a statutory scheme is a question that must be left to the Legislative Branch to resolve.

of bidding up the share price.  Finally, Microbot would take advantage of the increased share price by releasing new shares into the market, diluting its shareholders and diminishing the value of his shares, thereby harvesting from the market all value created by the positive news and using it to, among other things, pay ordinary expenses and compensate employees and executives.

(Counterclaim ¶ 36.)  By the time Mona completely exited his position in Microbot, he lost $150,954.  (Counterclaim ¶ 78.)

At issue are the following alleged material misstatements or omissions:

1.      Microbot's May 15, 2017, August 14, 2017, and November 14, 2018 SEC filing statements that it had sufficient capital to fund operations for the following twelve months; Gadot's August 14, 2017 conference call statement that Microbot had sufficient capital to fund operations for the following twenty-four to thirty months;

2.      Gadot's August 14, 2017 conference call statement that Microbot was five years ahead of its competition, and, after the FDA approved Alcyone's competing device on November 15, 2017, Gadot's omission to correct this "five-year head start" statement;

3.      Gadot's February 1, 2018 conference call statement that Microbot shares were "extremely cheap"; and

4.      Statements made by Jeremy Roe during an August 7, 2017 call to Mona (Microbot stock was "lightning in a bottle"; "the shares were going to get to $10" from $1; Roe had "just purchased an additional 10,000 shares in the company") and by Tony Altavilla during a October 2, 2017 call to Mona (Gadot was "out in Minneapolis on business, meeting two Fortune 500 companies"; Altavilla expected Microbot "to sign an SCS partnership any day").

26

Microbot argues that these statements are "forward looking" and therefore protected by the safe harbor provisions of the Public Securities Litigation Reform Act (the "PSLRA"). Alternatively, they are puffery, non-actionable opinion, time-barred, or not attributable to Microbot. Taking as true Mona's allegations of the statements made, Microbot is largely correct. None of the statements are sufficient to sustain Mona's securities fraud claims.

## A.    Section 10(b) and Rule 10b-5

Section 10(b) of the Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). And Rule 10b-5 states in relevant part,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange … [t]o employ any device, scheme, or artifice to defraud, … [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or … [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance …; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material

misrepresentation and loss." *Dura Pharamceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (internal quotation marks, citations, and emphasis omitted).

Under the PSLRA's stringent pleading standards, a plaintiff also must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief … state with particularity all facts on which that belief is formed"; in addition, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b). The Court will analyze the sufficiency of Mona's claims, addressing in turn the four groups of alleged misstatements.

## B. Sufficiency of Capital to Fund Operations

Mona alleges that all statements made by Microbot and Gadot about Microbot's financial health and ability to fund operations for the foreseeable future were false when made. Microbot knew that its May 15, 2017 filing statement was false when made because Microbot was "preparing to raise millions of dollars in additional funds." (Counterclaim ¶ 46.) Microbot also knew that its August 14, 2017 filing statement was false when made due to "the decline in [Microbot's] share price caused by Alpha's sale of large blocks of shares and Microbot's misrepresentations to Sabby" – and "as subsequent [dilution] events would reveal." (Counterclaim ¶ 53.) And Gadot knew that his August 14, 2017 conference call statement was false when made "as [Microbot's] later manipulative dilutive activity well within the 24-30 month period would reveal." (Counterclaim ¶ 61.) Finally, Mona asserts, Microbot knew that its November 14, 2018

filing statement was false when made "because management was actively preparing to raise more capital and dilute shareholders yet again." (Counterclaim ¶ 72.)

Microbot maintains that all of the challenged statements are protected by the PSLRA's safe-harbor provisions because they are forward-looking and accompanied by meaningful cautionary statements. In opposition, Mona claims that Microbot's cautionary language is mere boilerplate. Upon review of the case law and the relevant SEC filings, the Court agrees with Microbot that these sufficiency-of-capital statements are shielded by the PSLRA's safe harbor.

Under the PSLRA's safe harbor, "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. American Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010); *see* 15 U.S.C. § 78u-5(c). "Because '[t]he safe harbor is written in the disjunctive,' a forward-looking statement is protected under the safe harbor if any of the three prongs applies." *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 245-46 (2d Cir. 2016) (quoting *Slayton*, 604 F.3d at 766).

The statements at issue regarding Microbot's sufficiency of capital are forward-looking statements as defined by the PSLRA. The PLSRA includes several definitions of a forward-looking statement, including "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of

29

operations included pursuant to the rules and regulations of the Commission."   15 U.S.C. § 78u-5(i)(1)(A), (C).

Each of the statements made by Microbot and Gadot projects that Microbot will have enough capital on hand to fund operations for a year or more into the future.  As such, the statements fit comfortably within the definitions of forward-looking statements, particularly as "projection[s] of … capital expenditures" and "statement[s] of future economic performance … contained in a discussion and analysis of financial condition …."  *See In re SunEdison, Inc. Securities Litigation*, 300 F. Supp. 3d 444, 466 (S.D.N.Y. 2018) ("'[w]e expect cash on hand' and other funding sources to 'meet our capital needs for the remainder of 2015' is a … forward-looking statement"); *Gissin v. Endres*, 739 F. Supp. 2d 488, 507 (S.D.N.Y. 2010) ("alleged misstatements … cast in predictive terms … are by definition forward-looking").

The next question is whether the forward-looking statements in question are identified as such.  The Court looks to "the facts and circumstances of the language used in a particular report" with a focus on "[t]he use of linguistic cues like 'we expect' or 'we believe' … combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking …."  *Slayton*, 604 F.3d at 769 (internal quotation marks omitted).  Here, each of Microbot's statements is introduced by "Microbot[/it] believes," and each is closely preceded by a section clearly demarcated "Forward Looking Statements" in which the reader is alerted that "[f]orward-looking statements, which involve assumptions and describe our future plans, strategies, and expectations, are generally identifiable by the use of the word[ ] … 'believe,' … or the negative of [this] word[ ] or other variations on [this] word[ ] or comparable terminology."

(Tauber Decl., Ex. B, 5/15/2017 Form 10-Q, at 22, 25; Ex. D, 8/14/2017 Form 10-Q, at 20, 22; Ex. G, 11/14/2018 Form 10-Q, at 16, 23.)  In other words, Microbot's statements on sufficiency of capital are clearly identified as forward-looking statements.  *See Gissin*, 739 F. Supp. 2d at 507 ("[t]he use of linguistic cues … combined with an explanatory description of the company's intention to thereby designate a statement as forward looking satisfies safe harbor") (internal quotation marks omitted); *accord Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 361 (S.D.N.Y. 2019); *In re Barrick Gold Corp. Securities Litigation*, 341 F. Supp. 3d 358, 374-75 (S.D.N.Y. 2018).

As for Gadot's oral, forward-looking statement made during the investor conference call, the PSLRA requires an accompanying statement that the particular oral statement is forward-looking.  15 U.S.C. § 78u-5(c)(2)(A)(i).  Typically, at the beginning of an investor call, a representative of a company will recite a safe harbor statement not only alerting listeners that forward-looking statements are about to be made, but also referring listeners to the company's SEC filings setting forth the appropriate cautionary language.  Courts in this District recognize that this industry practice suffices both to identify a forward-looking statement and to attach cautionary language to that statement.[14]  *See In re Textron, Inc. Securities Litigation*, No. 19-CV-7881, 2020 WL 4059179, at *5 n.2, *11 (S.D.N.Y. July 20, 2020); *Steamfitters Local 499 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 364-65 (S.D.N.Y. 2019); *City of Providence v. Aeropostale, Inc.*, No. 11-CV-7132, 2013 WL 1197755, at *12 n.1

---

[14] Of course, the speaker may make cautionary statements during the call itself.  *See Wilbush v. Ambac Financial Group, Inc.*, 271 F. Supp. 3d 473, 481-82 (S.D.N.Y. 2017); *In re Carbo Ceramics, Inc. Stock and Options Securities Litigation*, No. 12-CV-1034, 2013 WL 3242352, at *5-6 (S.D.N.Y. June 26, 2013).

(S.D.N.Y. March 25, 2013); *Fort Worth Employers' Retirement Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 232-33 (S.D.N.Y. 2003); *see also City of Austin Police Retirement System v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 303 (S.D.N.Y. 2013) (collecting cases).   That is precisely what happened here.   At the beginning of the call, the audience was informed that "[a]ll statements in this conference call other than historical facts are forward-looking statements" and "may involve and are subject to … the risk factors and other qualifications contained in the company's Form 10-K that was filed with the Securities and Exchange Commission on 21 March [2017] and the [Form] 10-Q which was filed earlier today as well as other documents filed with the SEC." (Tr. 1-2.[15]) Thus, Gadot's oral statement on sufficiency of capital also is sufficiently identified as a forward-looking statement.

The last question is whether each of the challenged statements about capital sufficiency is accompanied by "meaningful cautionary language."   Cautionary language is "meaningful" when it is "not boilerplate and convey[s] substantive information." *Slayton*, 604 F.3d at 772.

> Cautionary language must be extensive and specific.   A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.   To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge. … The requirement for "meaningful" cautions calls for "substantive" company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.

---

[15] "Tr." refers to the transcript of Microbot's Investor Conference Call dated August 14, 2017.   (Dkt. 103-1.)   Microbot submitted this transcript following oral argument in response to the Court's request to do so.

*Id.* (first quoting *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2008); and then quoting *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004)) (internal quotation marks omitted).  "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials – including the cautionary language – to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'"  *In re Delcath Systems, Inc. Securities Litigation*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)).  "Plaintiffs may establish that cautionary language is not meaningful 'by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss.'"  *Lopez v. Ctpartners Executive Search Inc.*, 173 F. Supp. 3d 12, 25 (S.D.N.Y. 2016) (quoting *Halperin*, 295 F.3d at 359).

Here, the "allegedly undisclosed risk" was that Microbot might not have enough cash on hand to fund operations and therefore might need to issue new shares to cover the shortfall.  Upon reviewing the cautionary language accompanying each of Microbot's forward-looking statements about capitalization, the Court finds that Mona was both explicitly warned that Microbot planned to raise capital through equity issuances, and directly informed of the liquidity risks particular to Microbot that turned this plan into a near certainty.  In addition, Mona was alerted through cautionary language that was consistently "extensive," "specific," "substantive," and "tailored."  As a result, Mona, if acting as a reasonable investor, could not have been misled into thinking that Microbot's allegedly undisclosed risk did not exist.  *See Olkey v. Hyperion 1999 Term Trust, Inc.*,

98 F.3d 2, 5 (2d Cir. 1996) (affirming dismissal where "prominent and specific" cautionary language "warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed"); *Police and Fire Retirement System of the City of Detroit v. La Quinta Holdings Inc.*, No. 16-CV-3068, 2017 WL 4082482, at *5 (S.D.N.Y. 2017) ("a securities fraud claim for misrepresentations or omissions does not lie when the company 'disclosed the very ... risks about which [a plaintiff] claim[s] to have been misled'") (quoting *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 338 (2d Cir. 2011)).

For instance, Microbot's May 15, 2017 statement is both closely preceded and followed by language warning that Microbot "has funded its operations through the issuance of capital stock" and "plans to continue to fund its research and development and other operating expenses ... through future issuances of ... equity securities," which "could result in additional dilution to Microbot's shareholders"; disclosing that Microbot "has never been profitable and has incurred significant operating losses in each year since inception"; projecting that Microbot will continue to incur "increasing operating losses for at least the next several years" and require "substantial additional capital to continue its clinical development and potential commercialization activities"; and setting forth Microbot's liquidity position as of the latest financial quarter ("$4,790,000, consisting primarily of cash and cash equivalents"). (Tauber Decl., Ex. B, 5/15/2017 Form 10-Q, at 22, 25.)

The language accompanying Microbot and Gadot's August 14, 2017 statements is substantially the same: Microbot again reminds investors that it has never been profitable, that it consistently has incurred negative cash flows from operating activities, that it expects to continue facing increasing operational costs, and that it plans to

34

continue funding its operating expenses through future issuances of equity securities – which, of course, could further dilute Microbot's shareholders.  (*See* Tauber Decl., Ex. D, 8/14/2017 Form 10-Q, at 20, 22-23.)  In a note to Microbot's "Interim Condensed Consolidated Financial Statements," Microbot also reminds investors that it has issued a convertible promissory note to Alpha that "is convertible into [ ] Common Stock any time after November 28, 2017 and until the maturity date of November 28, 2019." (Tauber Decl., Ex. D, 8/14/2017 Form 10-Q, at 11).)  Under "Part II – Other Information," "Item 1. Legal Proceedings," Microbot further reminds investors that Sabby is suing Microbot for breach of the SPA and seeking rescission of the SPA, return of the $3,375,000 purchase price, and "damages … to exceed $1 million."  (Tauber Decl., Ex. D, 8/14/2017 Form 10-Q, at 25.)  In other words, contrary to what Mona suggests, Microbot fully disclosed the additional liquidity risks posed by the terms of its convertible note to Alpha as well as the potential monetary damages it was facing as a result of Sabby's suit for breach of the SPA.

Finally, Microbot's November 14, 2018 statement likewise is accompanied by cautionary language substantially similar to that found in Microbot's May 15, 2017 Form 10-Q.  (*See* Tauber Decl., Ex. G, 11/14/2018 Form 10-Q, at 22-23.)  Mona argues that this statement "was false at the time it was made[ ] because management was actively preparing to raise more capital and dilute shareholders yet again."  (Counterclaim ¶ 72.) In support, Mona cites to Microbot's amended preliminary prospectus filed on November 19, 2018, announcing that Microbot would be offering about six million new shares for sale.  (Counterclaim ¶ 74.)  Again, however, Microbot fully disclosed its liquidity risks and capital-raising plans well in advance – not only in its November 14, 2018 Form 10-

Q (*see* Tauber Decl., Ex. G, 11/14/2018 Form 10-Q, at 22-23), but in past filings with the SEC (*see* Tauber Decl., Ex. B, 5/15/2017 Form 10-Q, at 22, 25; Ex. D, 8/14/2017 Form 10-Q, at 20, 22-23).[16]

Mona likens the cautionary language used by Microbot to that in *In re Vivendi*. There, the Second Circuit found that there was sufficient evidence for a reasonable jury to conclude that the forward-looking statements in question were not accompanied by meaningful cautionary language.  Specifically, the language warned that an "inability to identify, develop and achieve success for new products, services and technologies; increased competition and its effect on pricing, spending, third-party relationships and revenue; [and] inability to establish and maintain relationships with commerce, advertising, marketing, technology, and content providers" were factors that "could cause actual results to differ materially from those described in the forward-looking statements." *In re Vivendi*, 838 F.3d at 247.  The court held that such "garden-variety business concerns that could affect any company's financial well-being" did "not bear even tangentially on Vivendi's liquidity risk," failed to meaningfully caution against reliance on Vivendi's statements regarding its free cash flow, and therefore was not meaningful cautionary language.  *Id.*

Here, in contrast, Microbot's disclosures state that it had "no products approved for commercial sale"; as such, it would require "substantial additional capital" to fund "commercialization activities," and it planned to fund these R&D and other operating expenses through equity issuances, which could further dilute shareholders.  (MBOT

---

[16] Mona alleges that Microbot filed its first amended preliminary prospectus "on November 19, 2018, on the *very same day* the November 10-Q was filed." (Counterclaim ¶ 74.)  But Microbot filed its Form 10-Q on November 14, 2018, five days before that.  (Counterclaim ¶ 72; Tauber Decl., Ex. G, 11/14/2018 Form 10-Q.)

Mem. at 17 (quoting Tauber Decl., Ex. B, 5/15/2017 Form 10-Q, at 25; Ex. D, 8/14/2017 Form 10-Q, at 23; Ex. G, 11/14/2018 Form 10-Q, at 23).)   These statements are supplemented by other meaningful cautionary language that Microbot does not mention. For instance, because Microbot "has no products approved for commercial sale," it "has not generated any revenues from product sales since its inception."   Rather, it "has raised cash proceeds … to fund operations[ ] primarily from government grants, loans, and private placement offerings of debt and equity securities."   Furthermore, Microbot "has never been profitable and has incurred significant operating losses in each year since inception" ("negative cash flows from operating activities") and "expects to incur … increasing operating losses for at least the next several years."   (Tauber Decl., Ex. B, 5/15/2017 Form 10-Q, at 22, 25; Ex. D, 8/14/2017 Form 10-Q, at 20, 22; Ex. G., 11/14/2018 Form 10-Q, at 22.)   This language – alerting investors that Microbot has never generated revenue, relied primarily on government grants and equity issuances for cash flow, and consistently incurred significant negative cash flows owing to operating losses (and only expects those losses to increase) – provides reasonable investors with ample basis to refrain from relying on Microbot's statements regarding its sufficiency of capital for future operating expenses.

These cautionary statements are not vague and generalized platitudes as the Second Circuit found insufficient in *Vivendi*.   Instead, they bear directly on Microbot's liquidity risk and potential dilution of shares, precisely the concern at the heart of Mona's claims.   *See In re SunEdison*, 300 F. Supp. 3d at 481-83 ("we continue to incur significant indebtedness to fund our operations"; "we expect our operations … to require substantial cash expenditures"; "we have … incurred losses and used substantial cash

in our operating activities and we expect to continue to incur losses and use cash in our operating activities"; and "[w]e will need to raise additional funds … to meet the operating and capital needs of our … business … in the form of … project financing or equity" were "meaningful cautionary statements" concerning company's liquidity over the coming year); *In re OPUS360 Corp. Securities Litigation*, No. 01-CV-2938, 2002 WL 31190157, at *5 (S.D.N.Y. Oct. 2, 2002) ("'We … have never been profitable' [and] 'We … expect to incur losses for the foreseeable future' … placed reasonable investors on notice that [ ] future forecasting concerning [the company's] financial condition should not be relied upon in making a decision to invest."); *see also In re Sanofi Securities Litigation*, No. 13-CV-8806, 2015 WL 365702, at *21 (S.D.N.Y. Jan. 28, 2015) ("These statements conveyed substantive information about the risk that ultimately materialized. As such, they were meaningful cautionary language, not mere boilerplate.").

In short, Microbot and Gadot's alleged material misstatements or omissions regarding sufficiency of capital all are forward-looking statements identified as such and accompanied by meaningful cautionary language.  Consequently, they are protected by the PSLRA's safe harbor provisions, and the Court need not and does not reach the question whether they were material or whether they were made with actual knowledge of falsity.

## C.    Gadot's "Five-Year Head Start" Statement Is Not Mere Puffery; But Mona's Claims Based on That Statement Are Time-Barred

Mona next argues that Gadot's August 14, 2017 conference call statement that Microbot had a "five-year head start on competitors" was false, and Gadot knew it was false when made, because on July 3, 2017, Alcyone had submitted a directly competing device for FDA approval.  Moreover, Gadot did not correct his statement any time after

38

November 15, 2017, when the FDA actually approved the device.  Microbot argues that Gadot's statement is non-actionable puffery and, at any rate, both the statement and Gadot's subsequent failure to correct it are time-barred as Mona brought his action more than two years after November 15, 2017, when a reasonably diligent investor would have discovered Alcyone's FDA approval by contemporaneous press releases.

Viewed in context, the Court cannot conclude that Gadot's head-start statement is mere puffery; nevertheless, Mona's claims relating to that statement are time-barred.

### 1.    Puffery

Statements are non-actionable "puffery" when they are "'too general to cause a reasonable investor to rely upon them.'"  *City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).  In making this determination, "there is no definitive test to determine how vague a statement must be to qualify as puffery," but "courts have focused on the imprecision of statements and whether such statements relate to future expectations."  *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488-89 (S.D.N.Y. 2018) (collecting cases).   Archetypal examples of puffery include "statements [that] are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'"  *City of Pontiac*, 752 F.3d at 183.  Whether certain statements constitute puffery also entails looking at the "context" in which they are made, including the "specific[ity]" of the statements and whether the statements are "clearly designed to distinguish the company" to the investing public in some meaningful way.  *Indiana Public Retirement System v. SAIC,*

*Inc.*, 818 F.3d 85, 98 (2d Cir. 2016); *see also In re Petrobras Securities Litigation*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (collecting cases).

On the one hand, Gadot's statement is not absolute but rather qualified by "probably," making it more of a boast and less a matter of fact. But, taken in context, Gadot's statement clearly is intended to specifically and meaningfully distinguish Microbot as the only player in the SCS/occlusion space at the time and therefore years ahead of the competition:

> So let's define competitors …. If you're talking about the direct competitor, something that will prevent occlusion, there is really, really nothing out there. There is one other company which is out … now in California. But they're really not focusing on the development of a Self-Cleaning Shu[n]t. So we're really playing in a blue ocean right now where we can – if we can bring the value then we are the leaders in that space. …
>
> So … the big companies actually not only they don't have deeper pockets but recently Codman was bought by Integra so one of the competitors is out of the market integrated into Integra. … Now there are a couple of IPs that are in academic settings but nothing is happening with them. So we probably have a five year head start on any other competitor.

(Tr. 14-16.) The Court thus cannot conclude that Gadot's head-start statement is non-actionable puffery. Nonetheless, Mona's claims based on that statement are time-barred.

### 2. Time-Barred

"[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws … may be brought not later than the earlier of – (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b).

"[A] cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation' – whichever comes first."  *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010).  "[T]he reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss."  *City of Pontiac*, 637 F.3d at 175.  "Only after a plaintiff can adequately plead his claim can that claim be said to have accrued, and only after a claim has accrued can the statute of limitations on that claim begin to run."  *Id.* "[T]he limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation."  *Id.* at 174.

Mona alleges that Gadot's head-start statement was false, and Mr. Gadot knew it was false at the time he made it; in addition, "at no time did Mr. Gadot correct his false statement made to Mona and other investors, thereby making an additional, material omission."  (Counterclaim ¶¶ 57-58.)  The Court must therefore consider when Mona could have adequately pleaded falsity of the head-start statement, and Gadot's knowledge of that falsity, such that Mona's claims accrued and the statute of limitations on those claims began running.

On November 15 and 16, 2017, multiple press releases announced that Alycone had secured FDA approval for its competing product.[17]  (*See* Tauber Decl., Ex. E.)

---

[17] "For purposes of evaluating Defendants' timeliness argument, the Court may, and does, take judicial notice of the fact of these news reports and testimony, 'without regard to the truth of their contents.'"  *DoubleLine Capital LP v. Odebrecht Finance, Ltd.*, 323 F. Supp. 3d 393, 436 (S.D.N.Y. 2018) (quoting *Staehr v. Hartford Financial Services Group*, 547 F.3d 406, 425 (2d Cir. 2008)).  *See also Staehr*, 547 F.3d at 427

Reported only three months after Gadot made his statement, this information bears directly on Microbot's then-competitive position and would have sufficed to alert a reasonable investor of the probability that Gadot's head-start statement was a misrepresentation.  That is, soon after the Alycone press releases issued, Mona, acting as a reasonably diligent investor, would have learned of facts enabling him to plead the same claims as he does now with respect to the head-start statement.  *See Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 200-01 (S.D.N.Y. 2020) (press release announcing internal probe "mark[ed] the date by which Plaintiffs believed 'the truth [began] to emerge' and the statute of limitations began to run") (citing *Dodds v. Cigna Securities Inc.*, 12 F.3d 346, 350 (2d Cir. 1993)); *Fogel v. Wal-Mart de México SAB de CV*, No. 13-CV-2282, 2017 WL 751155, at *9 (S.D.N.Y. Feb. 27, 2017) (reasonably diligent plaintiff would have discovered necessary facts "upon … publication" of newspaper article exposing internal investigation), *aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018); *In re Wachovia Equity Securities Litigation*, 753 F. Supp. 2d 326, 371 (S.D.N.Y. 2011) (barring equitable tolling, statute of limitations "likely" would have triggered on date of bailout announcement).

Mona argues that whether he was reasonably diligent in investigating his claims is a question of fact inappropriate for resolution on a motion to dismiss.  But courts routinely confront and resolve the question at this juncture.  *See LC Capital Partners, LP*, 318 F.3d at 156 ("'Where ... the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of

("It is unremarkable that courts consider the extent of media coverage in deciding when inquiry notice for securities fraud claims was triggered."); *LC Capital Partners, LP v. Frontier Insurance Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) (taking judicial notice of news article in evaluating whether plaintiffs had inquiry notice).

fraud can be gleaned from the complaint and papers ... integral to the complaint, resolution of the issue on a motion to dismiss is appropriate.'") (quoting *Dodds*, 12 F.3d at 352 n.3); *Dodds*, 12 F.3d at 352 n.3 (the "suggestion that the question of constructive notice is an improper subject for resolution as a matter of law is contradicted by a vast number of cases in this circuit resolving these issues at the pleading stage").

Mona also argues that it would go too far for this Court to expect a reasonably diligent investor "to perform industry-wide due diligence to investigate every competitor of any company they seek to invest in." (MTD Opp. at 14.[18]) Similarly, posits Mona, a rule that "false and misleading statements are not actionable if a lay investor could have located information that contradicted the statement … would enshrine a license to deceive." (MTD Opp. at 15.) The Court agrees. But that is not what the law demands, and it is not the standard to which this Court holds Mona.

Rather, *City of Pontiac* instructs the Court to consider whether a reasonably diligent plaintiff investigating Gadot's claim that Microbot had a "five-year head start" on its competitors would have discovered the press releases and the corresponding facts necessary to properly plead a Rule 10b-5(b) claim on or soon after November 15 or 16, 2017. That question having been answered in the affirmative, Mona should have filed his claims no later than or shortly after November 15 or 16, 2019. 28 U.S.C. § 1658(b). As Mona filed on February 4, 2020, months later, his claims that Gadot made and failed to correct the five-year head-start statement are time-barred.

---

[18] "MTD Opp." means Mona's Opposition to Plaintiff's Motion to Dismiss Mona's § 10(b) Counterclaim. (Dkt. 89.)

**D.      Gadot's "Extremely Cheap" Statement Was Non-Actionable Opinion**

Mona next argues that Gadot's February 1, 2018 conference call statement that Microbot shares were "extremely cheap" was false when Gadot made it and Gadot knew it was false when made "because Microbot shares were in the middle of a steady decline."  (Counterclaim ¶¶ 62, 64.)  Microbot contends that Gadot's statement was non-actionable opinion.  Microbot is correct, and Mona does not say otherwise in reply.

"[L]iability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 185-86 (2015)). Additionally, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor. … The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'"  *Id.* (quoting *Omnicare*, 575 U.S. at 189).  "In assessing what a reasonable investor would expect, the Supreme Court stressed the importance of context, such as 'the customs and practices of the relevant industry' and whether the opinion was expressed in a formal statement such as an S.E.C. filing or instead was a 'baseless, off-the-cuff judgment[ ], of the kind that an individual might communicate in daily life.'"  *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (quoting *Omnicare*, 575 U.S. at 190).

Although Mona alleges in conclusory fashion that Gadot's statement was false, Mona neither pleads nor argues that Gadot did not actually believe his own statement or

44

provided investors with untrue supporting facts.  To the contrary, Mona simply pleads that Microbot shares "were in the middle of a steady decline" – which suggests not only that Gadot's statement was true but that Gadot honestly believed what he was saying. (Counterclaim ¶ 64.)  Moreover, Mona neither pleads nor argues that Microbot omitted facts conflicting with how a reasonable investor would have interpreted Gadot's statement.  Seeing that Gadot made the "extremely cheap" statement during a "town hall" conference call with investors (and not in a formal SEC filing), and without more substantive allegations from Mona, the Court concludes that Gadot's statement was non-actionable opinion – no more than a "baseless, off-the-cuff judgment[ ], of the kind that an individual might communicate in daily life."  *See Abramson*, 965 F.3d at 175 (quoting *Omnicare*, 575 U.S. at 190).

## E.    The Statements of the Investor-Relations Consultants Are Not Actionable

Mona last claims that Microbot's IR consultants made "false and misleading statements to Mona personally about Microbot's financial health, and certain imminent business deals."  (Counterclaim ¶ 65.)  Both parties cite *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), in support of their arguments.  There, the Supreme Court held that, "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  564 U.S. at 142.  Microbot argues that because it "did not authorize or have control over" these alleged misrepresentations – made by employees of Integra Consulting Group LLC – Microbot was not their "maker" for the purpose of § 10(b).  (MBOT Mem. at 20.)  In opposition, Mona argues that the IR consultants in fact "are agents of Microbot, Microbot had control over the agents, and so

the agents' statements are attributable to Microbot."   (MTD Opp. at 12.)   There thus appears to be a material factual dispute over whether Microbot exercised "ultimate authority" over the IR consultants' statements.   Even assuming that Microbot wielded such authority, however, none of the IR consultants' statements are actionable.

Roe's statement that Microbot shares were "lightning in a bottle" was puffery in the purest sense.   "Lack[ing] the sort of definite positive projections that might later require correction," this statement was "too general to cause a reasonable investor to rely upon [it] and thus cannot have misled a reasonable investor."   *In re Vivendi*, 838 F.3d at 245 (internal quotation marks and citations omitted); *see also Abramson*, 965 F.3d at 173 ("Generic, indefinite statements of corporate optimism typically are not actionable."); *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("companies must be permitted to operate with a hopeful outlook").

Roe's statement that "the shares were going to get to $10" is a more specific projection; but "simple economic projections, expressions of optimism, and other puffery are insufficient" to support a claim for securities fraud, *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000), unless "they are worded as guarantees or supported by specific facts or if the speaker does not reasonably believe them," *In re NTL, Inc. Securities Litigation*, 347 F. Supp. 2d 15, 34 (S.D.N.Y. 2004) (citing *In re International Business Machines Corp. Securities Litigation*, 163 F.3d 102, 107 (2d Cir. 1998)).   Mona does not allege that Roe did not believe his own statement or that he supported it with specific facts that he knew to be false.   And, although Roe's projection exudes confidence, it is not worded as a guarantee.   *Compare Total Equity Capital, LLC v. Flurry, Inc.*, No. 15-CV-4168, 2016 WL 3093993, at *4 n.3 (S.D.N.Y. June 1, 2016) ("ballpark figures … not

tied to any time horizon" "could not reasonably be construed as a specific fact or 'guarantee'"), *with In re General Electric Co. Securities Litigation*, 857 F. Supp. 2d 367, 380 (S.D.N.Y. 2012) ("You can count on a great dividend, $1.24 board approved at the board meeting last Friday, $1.24 in 2009, $.31 a share in the first quarter," was worded as guarantee), *and Owens v. Gaffken & Barringer Fund, LLC*, No. 08-CV-8414, 2009 WL 3073338, at *6-7 (S.D.N.Y. Sept. 21, 2009) ("we personally guarantee[ ] the principal and floor minimum return of 8%" was worded as guarantee). Moreover, as "a statement of future economic performance," Roe's projection was a forward-looking statement, 15 U.S.C. § 78u-5(i)(1)(C); and, because Mona does not claim that Roe had actual knowledge that his forward-looking statement was false or misleading, that statement is protected by the PSLRA's safe harbor, *see Slayton*, 604 F.3d at 766; 15 U.S.C. § 78u-5(c).

As for Roe's statement that he had "just purchased an additional 10,000 shares in the company," Mona nowhere pleads that this statement was false.

With respect to Altavilla's statements that Gadot was "out in Minneapolis on business, meeting with two Fortune 500 companies," and that Altavilla expected Microbot "to sign an SCS partnership any day," Mona alleges in conclusory fashion that both statements were false "as no SCS partnership was ever signed, and at the time of the statement there was no reasonable probability to believe that a SCS partnership would be signed within a few days, or even a few weeks." (Counterclaim ¶ 67.) Absent are any specific factual allegations showing that Gadot was out somewhere else with someone else doing something else; nor does Mona's Counterclaim even articulate why Altavilla had little reason to believe that an SCS partnership would be signed. Mona

does no more than plead fraud by hindsight, which the Second Circuit has roundly rejected. *See Novak*, 216 F.3d at 309 ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. … Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *see also Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) ("In short, plaintiffs' theory of scienter ... is that because the release of [defendants' product] ultimately turned out to be a failure, defendants must have known that it would be a failure and lied about this fact to investors."); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (A bank filed a document stating it believed its loan loss reserve was adequate; two months later, the bank announced its reserve was inadequate and would require a significant addition.  The court found that the plaintiff's pleading "technique [was] sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud.").

Finally, as Microbot correctly observes, all of Mona's claims relating to the IR consultants' statements must be dismissed because Mona fails to plead reliance. Under the "fraud-on-the-market" theory, Rule 10b-5 plaintiffs may "invoke a rebuttable presumption of reliance on material misrepresentations aired to the general public."[19] *Amgen*, 568 U.S. at 461.  When such statements are not so aired, however, a plaintiff

---

[19] "The fraud-on-the-market theory rests on the premise that certain well developed markets are efficient processors of public information.  In such markets, the 'market price of shares' will 'reflec[t] all publicly available information.'"  *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 461 (2013) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)).

bears the burden of establishing reliance, as it "is an essential element of the § 10(b) private cause of action"; it "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (internal quotation marks and citation omitted).

Mona alleges that the IR consultants solicited him over private telephone calls. Mona therefore must demonstrate that he engaged in transactions based on their specific misrepresentations. Mona does not do so; as a result, his claims are improperly pleaded and must be dismissed on this separate ground.

## F. Scienter

As an additional basis for dismissal, Microbot argues that Mona's Counterclaim insufficiently alleges scienter as a general matter. Given the other deficiencies and bases for dismissal identified above, the Court need not and does not address the issue.

## Conclusion

For the foregoing reasons, I recommend that Microbot's motion for judgment on the pleadings and summary judgment motion be GRANTED; that a judgment of $484,614.30 be entered in Microbot's favor; and that Mona's Counterclaim be dismissed with prejudice with respect to all claims except that the following claims should be dismissed without prejudice to an opportunity to replead: (1) IR Consultant Roe's statements that "the shares were going to get to $10" and that he had just "purchased 10,000 shares in the company"; and (2) IR Consultant Altavilla's statements that Gadot was "out in Minneapolis on business, meeting with two Fortune 500 companies," and

that Altavilla expected Microbot "to sign an SCS partnership any day."  To sufficiently replead, however, Mona would have to allege, *inter alia*, specific facts indicating that the challenged statements were false or misleading.  Microbot's alternative request that the Court sever Mona's Counterclaim from this action should be denied as moot.  To the extent not addressed above, the Court has addressed Mona's arguments and finds them to be without merit.

### Procedures for Filing Objections

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of Court, with extra copies delivered to the Chambers of the Honorable George B. Daniels, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, New York, New York 10007.  **FAILURE TO FILE TIMELY OBJECTIONS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: December 18, 2020
         New York, New York

Copies transmitted this date to all counsel of record.